Thank you, Your Honor, and may it please the Court. Dr. May was convicted on 22 different counts, and this Court should reverse because of evidentiary errors and the jury instructions and insufficient evidence as to several counts. We don't have time today to discuss all of the issues that we have raised in our briefs, and so we're going to argue three or four of those and any others the Court wishes to hear. But by not making any particular arguments, we are certainly not waiving those that we waived in our briefs. We begin with aggravated identity theft. Those two counts should be reversed for insufficient evidence. The Supreme Court of the United States said in Dubin that to convict of this crime, the means of identification must be at the crux of the crime, not ancillary to it. In other words, who provided the services or products or who received the services or products, not merely how or when. And there are three cases that bear directly on this. In Dubin, as an example, the defendant overstated the employee qualifications and changed the dates on which the services were provided. The Supreme Court said although this may be a crime, it's not aggravated identity theft because it did not go to who provided the services or products. In our case, what the allegations are is that Dr. May signed prescriptions and that those prescriptions were to go to the individuals whose names were on the prescriptions. There was no misrepresentation as to who signed the prescriptions or who the prescriptions were to go to. Therefore, under Dubin, that's not aggravated identity theft. Wait a minute. What about like for Mr. I don't know how you say his name. Is it Hayes or Higgies? Yes, Your Honor. You know, it looks like there that he never voluntarily provided any of the means of identification. But instead, a co-conspirator stole it and that Dr. May has then used that identity. And so Hayes didn't participate at all. And so the crux of the fraud in this case could be arguably that his identity was, in fact, stolen and used. Now, Patterson's a different story, right? But what's wrong with that? Well, again, it goes back to what the United States Supreme Court said in Dubin, which is that it's not it can't to be aggravated identity theft. It can't be simply a misrepresentation of who the products were, who provided the service of products and who they were going to. And so in this case, Mr. Higgies was to receive those products. And so that does not fall within in Dubin. We have a similar case from the 11th Circuit shortly after Dubin. That's the the Gladden case. And that's informative because there were several defendants there. And some of those, the 11th Circuit said, met met the requirements for aggravated identity theft. And another defendant did not. In particular, Linton met the requirements for aggravated identity theft because she had actually used a doctor's signature, forged it without the doctor's permission. And the prescriptions were not going to the individual who they were designated for. They were going to a third party. So that was aggravated identity theft because there was a misrepresentation about who the services were to go to. On the other hand, another defendant in that case, Mr. Gladden himself, the prescriptions were not medically necessary and they had used somebody else's name, but there was no misrepresentation about who they were to go to. They were going to that person. So the 11th Circuit reversed on that count of identity theft. And finally, even in the case that the government cites in O'Lear, the defendant forged the names of the physician and the x-ray tech. So again, there was a misrepresentation about who had actually provided the services. And in that case, therefore, that was aggravated identity theft. Here, we don't have that. Their doctor may sign the prescriptions. Nobody is disputing that. And the prescriptions were to go to Hedges and to Patterson. And so those two counts of aggravated identity theft had insufficient evidence to convict and should be reversed. Now, the government argues that the sentencing package doctrine applies. But I would say we have a unique statute here in that the aggravated identity theft statute says that when the district court is determining the length of the sentence for all the other crimes, it is not to consider the two additional years that are to be tacked on for aggravated identity theft. And so in this case, when the district judge was looking at the factors in 3553 A1, the judge was not to consider the aggravated identity theft. And so the sentencing package doctrine simply would not apply to these convictions. Second reason that... Why isn't Hedges' status as a TRICARE beneficiary the actual crux of the fraud? And that's such that there is aggravated identity theft when his identity is stolen and the prescription is written? Again, there's not a misrepresentation of who was to receive the product. As the Supreme Court said, it might be some other crime, but it's not aggravated identity theft under that statute. And so there is not a misrepresentation as to who would receive the products or who provided the products. I'm looking at the statute. I just don't know if that's what it says. But, you know, I'll take a look at it. Thank you. All right. This court should also reverse because the district court limited Dr. May's cross-examination of Derek Clifton. You may remember that Derek Clifton was one of the star witnesses of the government. He was the sole person who had the contact with Dr. May. He's the one who convinced Dr. May to start signing prescriptions, not so that Dr. May could make because he targeted Dr. May because Dr. May was a proponent of keeping people off of opioids. He is the only person who allegedly paid Dr. May. So this was a key link in the conviction of Dr. May. And the defense theme was that Derek Clifton was a master manipulator and a liar. And so what Dr. May's counsel wanted to cross-examine Clifton about, in particular, that the court denied, was at one point in 2020, Derek Clifton reports to the hospital and says, oh, I don't use drugs. 2021, when he's suddenly wanting to get out on the compassionate release program, Derek Clifton says, oh, I use drugs every day, cocaine and other things. Well, even though that didn't get in, you know, Clifton was cross-examined on numerous other lies. When I looked at the transcript, it looked like there were seven or eight different points where they cross-examined him on other misstatements. He lied about not having firearms. He made inconsistent statements about paying May. And there was questioning about his motives for lying at trial. And so that all came in. Where is the prejudice that would be attached? I mean, even if we found this abuse of discretion, how did it impact the verdict when there's already evidence of like five or six or at least other lies that Clifton told? If it was some other witness, I would agree with you. But Derek Clifton was the key witness against Dr. May. And yes, he told other lies. But in this case, he's telling lies to the Bureau of Prisons to get out. That notches it up a level to me when you start lying to the Bureau of Prisons to try to get out. So it's the nature of the fact that he's lying to get out of jail and here he's lying to shorten his sentence to help the government out? I think it notches it up a little bit. Okay. And in fact, the government, you may recall, and the district court actually found this, that to ask Clifton about this lie would unfairly prejudice the government. And the government told us multiple times in the brief, I counted 11 times, their evidence was overwhelming. How in the world could asking Clifton about a lie unfairly prejudice the government with this case, with all of its resources, and Dr. May over here just wants to ask about another lie? That's certainly an abuse of discretion. I would say it was also harmful because it showed yet another instance of Derek Clifton lying and certainly was an abuse of discretion. I think this goes to most of the counts too. If this court reverses on that, it should reverse on all of the was the district court shifted the burden in closing and here's how the court did that. If you may remember, there was Mr. Beach, who was an FBI agent, who participated in the investigation for the FBI. He, along with Hudson, who did testify, it was, excuse me, Beach who prepared the 302 report, who took the notes at the investigation and he also interviewed one of the other patients. And during the course of the trial, Dr. May's counsel says, Judge, we want to bring Beach up here on the stand and ask him about some of the notes he made. And the government said, oh, your honor, that would just be too much problem. Yes, Mr. Beach has actually been in the courtroom during trial, but it's just too much trouble to get him up on the stand because we'd have to go up to Washington, D.C. and somebody would have to come back and approve that. And even though, and so what happened, Dr. May's counsel got up in closing argument and says, jury, they could have brought up Beach and these other witnesses, they didn't bring him up. And the government gets up in rebuttal in closing and says, and the judge let them do this, Dr. May could have subpoenaed all of these people. Well, the government can do that usually, but there's an exception. If the witness is solely within the government's power, the government can't get up and make that statement in rebuttal closing argument. Well, why was the witness solely in the government's power, right? I mean, we had the power to subpoena and Mr. May's counsel could have subpoenaed this guy in advance of the trials. So why is this, this is, this is not a witness that the government can claim some sort of privilege on that they can't, that may not allow them to testify. This is someone who is still subject to the subpoena powers of the court. Well, Dr. May's counsel said, we would like to do that. But the government said, no, it's going to be too much trouble. Granted, maybe Dr. May waited until... Did the defense counsel ever ask the court to issue a subpoena to compel him to attend? I don't recall if that's in the record or not. I do not remember offhand. I'll be happy if the court wants us to address it in a subsequent letter, whether that happened. But at the end of the day, the government said, no, you can't bring him up here. And so it was improper because what the effect of that was, it allowed the government to go back to the jury and instead of the government having the burden, the government then shifted the burden to the defendant, say, you didn't bring up these witnesses that were government witnesses anyway or would have been favorable for the government. You didn't bring him up. And it shifted the burden. And that was an abuse of discretion. And the courts reversed for that reason as well. Your Honor, I'm almost into my rebuttal time. I'd be happy to answer any questions that you have. I do have a question on the, on count 40, having to do with the identity of Perry Patterson. Yes. Is that a, are you making there a sufficiency of the evidence challenge or is there, is it an instruction challenge? It's a sufficiency of the evidence challenge. We did not make an instruction challenge on that. I think in Gladden, one of the, one of the reasons that the 11th Circuit reversed there was because of a jury instruction challenge. We did not make that argument. Our argument is a sufficiency of the evidence challenge, Your Honor. And your principal case that you rely on there, is it Dubin? Well, it's Dubin and it's Gladden, especially with regard to Gladden, the defend, there were two defendants in Gladden and it's a Mr. Gladden himself because those are similar. They did not involve, they did not involve taking the identity and that was not the crux of the crime. And was, was Dubin decided after the conviction in this case? Yes, Your Honor, Dubin was decided after. So does that make, does that make a difference? I think it does make a difference. Now, I think the, the review of the court is probably still a plain error review and, and that's what it was in Gladden as well and, and the 11th Circuit reversed in Gladden even under a plain error review. Okay. So if Dubin came out later, how could the error be plain? Um, well, the 11th Circuit found that it was, um, and so, and I, I don't recall out of him what the 8th Circuit precedent was on that, uh, but the, the United States Supreme Court, I believe, and I believe it was a unanimous decision, there were some concurrences, uh, in Dubin, but I believe it was a unanimous decision and so the, the, this court has not precluded from finding plain error even if Dubin came out afterwards. Okay. If, if, uh, the court were to side with you with respect to, uh, the, uh, Patterson event, would that affect Dr. May's sentence? To Patterson only but not, yes? Yes. Uh, unfortunately, I don't think it would. We would need to wait on both of those counts because under the, uh, statute, the, the judge is to add two years for aggravated identity theft and can run those concurrently and so, in this case, Judge Baker ran those concurrently, which she was able to do, and so, I think, to get to your question, I think we would need to win on both of those counts. All right. Thank you. Thank you. All right, Mr. Morgan, you may proceed when you're ready. Good morning, Your Honors. May it please the court, Alex Morgan for the United States. Your Honors, the jury sat for a week and a half in this case, listened to two dozen witnesses, received over 400 pieces of evidence, and after considering the record before it, returned guilty verdicts on each and every count, and it was right to do so because the evidence on each of the counts was overwhelming. Throughout the proceedings, Judge Baker made a number of rulings that are now on appeal. Her decisions were well-reasoned on the record and supported by the law throughout. None of them exhibit any abusive discretion, and review of the 1028A counts on plain air under Dubin does not affect the outcome because, as we explained in the briefs, the United States embraced a narrow view of that statute when charging and limited counts to situations where there was active deception central to the fraud in how the means of identification were used. And I'm happy to address whatever questions Your Honors might have, but I'll start with... Well, I'll ask the... Sure. Why is it plain error review? Because it was not brought to Judge Baker's attention below, and we're challenged here with assessing the facts as they were presented in the record as it was developed for Judge Baker, and so it's rather unfair to her or any district judge for that matter to sit up here and make arguments and reference Supreme Court decisions that weren't before her at the time. And so what we do, as the Sixth and Eleventh Circuits did in Gladden-O'Lear, is we mine the record and view it on plain air and see whether or not the evidence rises to the level to that which might support a conviction under the standard articulated in Dubin. And here I believe it does because, as we explained in the briefs, we embraced this narrow view... I'm sorry, because why? Because we embraced a narrow view of the statute when charging it and limited to situations where there was active deception as opposed to a piece of paper that happens to be used in the course of a mail fraud or a wire fraud that bears Judge Erickson's PII or your PII, right? And so let's say it's the beginning of your week here in St. Louis for oral argument, and as judges sometimes do, you guys go out and have a wonderful meal. Sadly, unbeknownst to you, Judge Erickson, you ordered filet mignon and you got flank steak or some lesser cut of meat. We all agree and we all know now, thanks to the Supreme Court, that's a lot of things, but that's not aggravated identity theft. Because at the end of the day, this is really about overcharging you for a cut of meat. And so the Supreme Court's made clear this isn't about the steak-switching waiter. But now suppose that steak-switching waiter takes your PII that he or she gained during the course of this transaction and uses it to manufacture a prescription without your knowledge, without your consent, all with a view to bleeding your TRICARE benefit or Medicare, Blue Cross, United, whatever you may have, such that when you return to North Dakota from your week here in St. Louis, you're greeted by a strange brown box on your doorstep. And no, this is not an Amazon box or something that you or your family member ordered. This is some compounded pain cream from a pharmacy in Mississippi. You open it up, you see an EOB suggesting that it's been authorized by a provider in another state that you've never heard of. But this isn't a mistake because it's got your name, it's got your social security number, it's got your date of birth. I think to find that someone can involve you in an offense without your knowledge or consent turns the rule on its head. And the whole point of Dubin, if we're going to scrape away all the legalese, is to make it more commonsensical, right? Is this about an hour-inflating lawyer or a stake-switching waiter, or is there something more here, right? Is the presence of PII just sort of a passive, a long for the ride, or is it central to the  And Judge Erickson, as you pointed out, it was absolutely central to Count 35, and I'll help with the record here. It's spelled Heggies, but it's pronounced Hedges. I was surprised to learn that as well. And while we're correcting the record, one other thing I'll point out is when it comes to Patterson, there's some confusion as to what that relates to. And I'll direct your honors and your clerks to docket entry 59, which is the superseding indictment. And you'll see that Count 40, which is the 1028A related to Mr. Patterson, is tied to his phony medical chart, not the underlying prescription. So the underlying prescription, if you look at his mail fraud count, is generated in 2015, which is what I'll call the active phase of the conspiracy when we're generating fraudulent claims, fraudulent prescriptions. In 2016, beginning with this FBI interview and the issuance of grand jury subpoenas and whatnot, we get into the concealment phase of the conspiracy. And at this point in time, in addition to lying to the FBI, what providers, including Dr. May do, is they double down on that lie by creating phony medical charts suggesting that all these people who showed up on these bogus prescriptions were, in fact, bonafide patients who were consulted, evaluated, presented with certain medical conditions that somehow justified the prescriptions at issue. And so if you look at Count 40. So the medical records were fabricated as part of a cover-up? Absolutely, your honor. And that. And that occurred after the FBI began investigating? Correct, your honor. If you look at the superseding indictment and the record in this case, and in particular, in particular, you can rely on the testimony or you can rely on the records themselves. Because, of course, multiple versions of Patterson's prescription were admitted at trial, as was a version of the phony medical record. And so the sequence of events is this. In 2015, Mr. Patterson, who is a TRICARE beneficiary and also works at, I think he's a deacon at Mount Zion Baptist Church in North Little Rock, Arkansas. Someone says, hey, you're in the military. You've got TRICARE. How would you like some free drugs? Guess what? You can get some money for trying them out. Who turns down that offer? And so, sure enough, Patterson testifies, yeah, sure, I'll try it out. And he shares his PII in order to get the drugs off the ground, not realizing at all what he's being tied into. And so I think that is a separate animal. That's 2015. Now, in January of 2016, January 26th of 2016, in particular, Dr. May drives to the FBI Little Rock field office, sits across the table from Special Agent Beach and Special Agent Hudson, and speaks at length about, oh, yeah, I signed these prescriptions, and oh, yeah, they were all medically indicated. And they say, well, that's wonderful. We'd like to see the underlying medical records. And they slide across the table a subpoena. And so now he's in a pickle. And what does he do? He works with Derek Clifton, Glenn Hudson, and other conspirators to double down on this lie and to try and paper up the record to make it look as if, yes, absolutely, these were legitimate prescriptions. And in order to do that, what he does is he takes the PII that Patterson had given willingly in 2015, not fully realizing what he was involved in, and misappropriates it in fabricating this altogether fictitious medical record. And we don't have to guess at what the truth is, because when he was on the stand, Mr. Patterson testified at length, absolutely, I signed up to try out these drugs in no uncertain terms. No, I did not give anyone permission to misuse my PII on this chart here, which is utter fiction. And oh, by the way, had someone picked up the phone and asked me, I would have said, absolutely not. You can't use my PII to that end. And that's precisely the situation that presented in O'Lear. That case, if you pull the indictment and you look at the record, involves something like 25 substantive health care fraud counts that took place between 2014 and 2016 or thereabouts. And there, much like here, beginning in and around 2017, people start asking hard questions. In an effort to cover up the fraudulent nature of the underlying X-rays and whatever other medical services were at issue in that case, the defendant in O'Lear sees fit to start manufacturing medical charts to suggest that all the services were rendered and further that they were medically indicated. And in that effort, what he does is he reaches out and he takes other people's PII and slaps it on there. And again, what I'll suggest is that Dr. May's position here takes an overly narrow view of involvement, right? Is HEDGES involved in this prescription in any meaningful way? Absolutely not. Is that central to the fraud? You betcha. Why? Because had anyone known the truth, be it the pharmacy or the TRICARE or anyone else or the FBI, it would have created significant problems. And I don't say that supposing that to be the case. I know it to be the case because that's precisely what happened here. And I can say that because he testified that when he's wrapping up Army basic training and his phone rings and he alerts the pharmacy, wait a second. That's my PII. No, no, no. I'm Mr. HEDGES, all right. But all that other stuff on there is bogus. I don't know this doctor. I don't know these creams. What are you talking about? How did you get this? He's frightened. Counselor, do you know a case called the United States against Ovespian, a circuit case? Is, I believe that's the case that dealt with the presence of PII sitting in, it happened to be in charts. The later use of identity. I think that one is distinguishable because there the argument was, well, the PII was used in the sense that we had to maintain it on these charts in case anyone asked questions later and the person at issue didn't become involved in the conspiracy until much later. Here, I'm not holding someone to account for Dr. May having misappropriated the PII at some earlier point such that I can say, well, I can't attribute that to you over here. Dr. May has his hand in this. And so I think the more analogous case is O'Lear where we have underlying fraudulent claims, a scheme that involves, among other things, concealment. And in the course of that concealment, when people start asking questions, be it an auditor from Medicare or a special agent from the Federal Bureau of Investigation, now I start misappropriating that PII to manufacture charts to sort of cover my basis. Well, let me ask you about the conviction that involved a Ms. Holiman, is that the way she said her name? Ms. Holiman, yes. Holiman. Well, I would say that, sure, the existential problem for the defense is that Don Wunderland, the TRICARE witness, made clear that had TRICARE known there was a kickback relationship as between the prescriber and someone else, the claim would have been invalid. And the jury instruction for mail fraud, and this is going to be instruction number 21, made clear that the scheme and intent to defraud involves a number of things to include concealment of material facts. And Mr. Wunderland made clear, absolutely, the existence of a kickback relationship is a material fact. But what was the evidence that this prescription was not needed? The evidence the prescription was not needed was that Dr. May evaluated this woman 11 times, and each of those 11 times he created a note indicating, among other things, whether or not this woman reported pain and whether or not he observed pain. And every one of those 11 times he reported that no pain was reported, no pain was observed. And what's more, this is in her charts. It was 1,937 pages from Baptist, Hot Spring County. And everything from Tylenol to serious drugs to her diet, everything is memorialized in the chart. And there was ample evidence in the form of testimony from his residency director and paperwork that he executed when getting credentialed for Baptist, acknowledging that it is imperative that you memorialize all treatment, all prescriptions, et cetera. And so in spite of him and everyone else at that hospital memorializing every last thing that happens to her, this isn't off the book's prescription. There was a Tylenol prescription, was there not? That was documented and that was PRN. And so that's a doctor telling his nurses, hey, if and when she has any discomfort, you can go ahead and use Tylenol. That's quite a different animal. I would submit them saying... Well, but he did direct that kind of pain medicine. Well, Your Honor, that's one of those things where we're here on a standard where we view the evidence and draw all inferences in favor of the verdict. And sure, in a vacuum, if all Your Honor was aware of was, well, he prescribed a year's worth of pain meds and there was also Tylenol, PRN, okay, maybe it's a toss-up. But here we further know that it's an off the book's prescription in spite of him having been trained and him acknowledging that it's imperative to log all these things. He's faxing the prescription and having it sent to a facility that he himself is acknowledging she can never go back to. And the jury was instructed, and we know, that concealment can lead to negative inferences. And here, all signs point to, if you want to give him a pass on medical necessity, him actively concealing this. And so I think it stands to reason, if you're the juror in this case and you're looking at this and saying, look, why of all people is she getting this prescription? Might it have something to do with the fact that she's suffering from advanced dementia to the point that she needs a sitter around the clock and she can't go back to assisted living? She's going to basically have to be in a hospital the rest of her life. I submit to you she was a vulnerable victim and he preyed upon her. I'm still stuck on Patterson a little bit. And what I'm looking at is, if you look at count 40, basically in the superseding indictment it simply says that there was a use without lawful authority of means of identification to wit. The lawful identity in the setting forth the, during the relation of the crime of mail fraud is set forth in count 18, right? If you go back looking at count 18, it's just like a line in a chart and it says that on April 23, 2015, Clifton May is the defendant and that drugs were shipped from pharmacy number one in Mississippi to PP in North Little Rock via an interstate carrier. Now how in the world was the jury supposed to surmise that that's about the medical records that were created, not the prescription itself? And was that argument presented to the jury? Yes, because count 40 says in and around February of 2016, i.e. the concealment period, in 2015 the mail fraud count relates to 2015 when drugs are actually shipped and this lines up squarely with O'Lear where the underlying count is during the prescription phase and the cover-up count is during the concealment phase, both of which are part and parcel of the scheme to defraud. Okay, so it's the new reference to the date of February 2016 is sufficient to provide the notice there? If you look at the records, Your Honor, there's ample testimony that this entire transaction, the generation of records, all takes place in 2016 after the subpoena, after the FBI interview, after we've committed ourselves to this grand lie that these are all bona fide patients who are consulted. Okay, thank you. And counsel, back on the standard of review there with respect to count 40 and the sufficiency of the evidence, do I understand you correctly to say that it's, it would be plain error review because the appellant did not identify to the district court the exact nature of the deficiency in proof? Absolutely, Your Honor, and at this stage we look and we mine the record and say is there sufficient evidence that a jury could find that the PII used in 2016 during the cover-up phase was used in a deceptive manner to signal that he was involved in the generation of this prescription in the form of actually presenting and having been evaluated by Dr. Dubin. The truth, it was nothing like that. So then, if I'm following you, now on appeal to rely on a subsequent case, Dubin, you say that would be something that was not presented and could not have been presented to the district court? Was not presented, could not have been presented, but does not change the outcome here because as we make clear in our briefs and earlier today, we embraced that narrow overview when charging 1028A and limited ourselves to situations where your PII was either stolen or misrepresented and used deceptively to get one over on the pharmacy or TRICARE. Thank you, Your Honors. All right, thank you. Counsel, we used up some of your time with questions. And so, I'll allow two minutes for rebuttal. And also, before you begin, and before I forget to do so, court wishes to express its thanks for your services in the case under the Criminal Justice Act. Thank you, Your Honor. I appreciate that. You may proceed. On aggravated identity theft, the question in determining whether the statute as interpreted by the Supreme Court applies is not whether the actions were wrongful. The question is whether the actions fall within the statute as interpreted by the Supreme Court. In this case, they certainly do not. We go back to that question of was the misrepresentation as to who provided or received the services, not simply how or when. As to O'Lear, in that case, the defendant forged the names of the physician and x-ray tech to make it look like they conducted the x-rays they billed for. That squarely falls within Dubin, because that's a misrepresentation as to who provided the services. That's not what we have here. Again, every patient was to receive the prescriptions here. Regarding the Patterson Count 40, I think Judge Erickson's point is well taken. This was something that was created after the fact of all the wrongdoing was this medical chart. Again, there's no misrepresentation about who did these services or who was to receive the prescriptions. Patterson, in our view, does not apply. Judge Arnold, as to your questions regarding Ms. Holloman, you won't know this by looking at the government's description of the exhibits or the briefs, but there was evidence in Ms. Holloman's medical chart that she reported to the hospital with pain. There were instances at the hospital where she was in pain. Did Dr. May observe any of those? That's not in the records, but there were those things in the records about her having pain and being in pain in the hospital, and also about her having skin creams, which those were one of the things that were subsequently provided to her as well. There is evidence of those things in the record, despite what the United States said below at the district court. So I think I've covered those issues that I needed to cover. My time is up, so unless there are any other questions, we'll be done. All right, thank you, counsel. Thank you, your honors. I may be excused as well, your honor. Yes, you may stand aside. Counsel, the case is submitted. We'll render a decision in due course, and thank you for your arguments this morning.